IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| KASHIEM THOMAS, | § | |
| | § | No. 99, 2019 |
| Defendant Below, | § | |
| Appellant, | § | |
| | § | Court Below—Superior Court |
| v. | § | of the State of Delaware |
| | § | |
| STATE OF DELAWARE, | § | |
| | § | Cr. ID No. 1703001172 (N) |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: February 19, 2020
Decided: March 4, 2020

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices, constituting the Court *en Banc*.

## **ORDER**

This 4th day of March, 2020, having considered the briefs and the record below, and following oral argument, it appears to the Court that:

(1)  A jury convicted Kashiem Thomas of first-degree murder and possession of a firearm during the commission of a felony ("PFDCF").  Thomas moved for judgment of acquittal for insufficiency of the evidence.  The Superior Court denied Thomas's motion because the trial evidence was sufficient for a rational jury, viewing the evidence in the light most favorable to the State, to find each element of the crimes beyond a reasonable doubt.  Thomas appeals.  For the reasons below, we agree with the Superior Court and affirm Thomas's convictions.

(2)     The evidence at trial showed that, on the evening of February 23, 2017, Keeven Hale was on his porch at 602 East 23rd Street, where he lived with his mother, two sisters, and nephew. Hale was drinking beer and talking with his neighbor, Haile Omar Baird. About one block away, video surveillance recorded Thomas purchase a cigarette from a convenience store on the corner of Pine and East 23rd Streets. Thomas wore dark pants, a black North Face jacket, and a ski mask rolled up on his forehead. After smoking the cigarette, Thomas walked in the direction of his home on the 300 block of East 23rd Street. Thomas stopped briefly to interact with a car that pulled up and then continued to walk toward home.

(3)     Minutes later, Thomas reappeared on the surveillance video. Thomas now had the ski mask rolled down over his face, hood pulled up, and his right hand in his pocket. Thomas passed the convenience store and walked toward the 600 block of East 23rd Street. Then he disappeared from the surveillance camera's view. The video surveillance also captured two cars driving up the 600 block behind Thomas.

(4)     Forty-one seconds after Thomas walked out of view, ShotSpotter gunshot detection sensors detected ten gunshots outside of Hale's address. From inside her home, Hale's mother witnessed Hale fall through the front door bleeding. She called 911. While on the phone, she retrieved Hale's handgun from the porch.

She passed the still-hot gun to Hale's sister, who tucked it under the arm of the couch.

(5)     Corporal Thomas Kavanagh arrived on scene just one minute and thirty-two seconds after the ShotSpotter alert. Kavanagh found Thomas injured on the sidewalk between Hale's and Hale's neighbor's houses. Kavanagh tried to render medical assistance, but Thomas resisted. An unidentified man wearing a yellow traffic vest appeared and told Thomas, "Yo, don't answer his questions, don't tell the cops shit."[1] A crowd began to form around Kavanagh and Thomas. The crowd crouched around Thomas and hindered Kavanagh's attempts to provide aid. Still, Kavanagh waited with Thomas until the paramedics arrived. Medical personnel later determined Thomas suffered a single gunshot wound to his lower back.

(6)     More police officers responded to the scene to assist Kavanagh. Officer Jahlil Akil entered Hale's house and found Hale on the living room floor. Hale had sustained four to six gunshot wounds in his torso and upper extremities. After helping with crowd control outside the house, Detective Brandon Mosely joined Akil inside. Mosely asked Hale, "The guy outside shot you, buddy?"[2] Hale responded

---

[1] App. to Opening Br. at A023.
[2] *Id.* at A043.

3

affirmatively.[3]  Hale was unable to answer Mosely's follow-up inquiry for a description or whether Hale knew the shooter.  Paramedics took Hale to the hospital, where he succumbed to his gunshot wounds.

(7)  The night of the shooting, officers searched the scene.  The officers found a Walther PPS .40 caliber Smith & Wesson handgun underneath a couch armrest in Hale's living room.  In Hale's lawn, the officers found four Smith & Wesson .40 caliber cartridge casings and three plastic shot shell casings with 410 bore.  From the door of a car parked across the street from Hale's home, the police recovered a discharged .40 caliber copper bullet jacket fragment.  The glass door of Hale's home had shattered.  Multiple projectile holes covered the door frame of the neighboring home.  The officers did not find Thomas with a gun.  The State never recovered the gun responsible for Hale's death.

(8)  Months after the shooting, Hale's neighbor Baird spoke with a State detective at a police station.  Baird recounted to police that, on the night of the shooting, he spoke with Hale before leaving to purchase beer.  Baird said he passed a man wearing all black and a mask.  Then he heard gun shots.  Baird turned around to see the man in all black lying on the sidewalk and Hale run into his house.  He

---

[3] *Id.*

saw no one else. Baird then fled the scene because he had drugs and did not want police to think he was involved in the shooting.

(9)     Throughout the investigation and at trial, the State engaged multiple experts. Investigators swabbed Hale's and Thomas's hands for gunshot residue ("GSR"). Experts concluded that the amount of GSR particles on Thomas and Hale raised three possibilities: both had either (1) discharged a firearm; (2) been in close proximity to a firearm discharge; or (3) picked up GSR particles through transfer. The State also introduced two ShotSpotter analyst reports. One analyst found that the first five shots were fired from the sidewalk directly in front of Hale's house. Three shots were then fired from Hale's lawn. And two more shots were fired from the lawn directly adjoining Hale's. The other analyst concluded that the initial shots were fired from the street.

(10)    After the State rested its case, Thomas made a motion for a judgment of acquittal. The trial judge denied the motion. The jury convicted Thomas of first degree murder and PFDCF. Thomas then filed a motion for judgment of acquittal. After briefing, the trial judge denied the motion.[4] On February 8, 2019, the court sentenced Thomas to life plus fifteen years in prison. On appeal, Thomas argues that the Superior Court erred when it denied his motions because the State failed to

---

[4] *State v. Thomas*, 2019 WL 669934 (Del. Super. Feb. 8, 2019).

5

present evidence sufficient for a rational trier of fact to conclude that Thomas possessed a firearm or that he shot Hale.

(11) For insufficiency of evidence claims, this Court reviews the record evidence *de novo*.[5] The Court does not ask whether "*it* believes that the evidence at trial established guilt beyond a reasonable doubt."[6] Rather, the inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[7] In making this determination, "the [C]ourt does not distinguish between direct and circumstantial evidence."[8] Further, it is entirely within a jury's purview to assess witness credibility, resolve conflicts in testimony, and draw rational inferences from circumstantial evidence.[9]

(12) Thomas argues the State's evidence only places him at or near the scene of the crime. He argues that there are gaps in the State's evidence—no eyewitness testimony that he shot Hale, no direct evidence that he possessed the intent or means to kill Hale with a firearm, and no recovered murder weapon. And because of these

---

[5] *See White v. State*, 137 A.3d 971, 2016 WL 2585743, at *2 (Del. Apr. 25, 2016) (TABLE).
[6] *Skinner v. State*, 575 A.2d 1108, 1121 (Del. 1990) (citing *Colvin v. State*, 472 A.2d 953, 964 (Md. 1984)).
[7] *Stevenson v. State*, 181 A.3d 631, 2018 WL 1136524, at *2 (Del. Mar. 1, 2018) (TABLE) (quoting *Williams v. State*, 539 A.2d 164, 168 (Del. 1988)).
[8] *Robinson v. State*, 953 A.2d 169, 173 (Del. 2008) (citing *Skinner*, 575 A.2d at 1121).
[9] *See Poon v. State*, 880 A.2d 236, 238 (Del. 2005). *See also Lemons v. State*, 32 A.3d 358, 362 (Del. 2011) ("The jury may also draw rational inferences from proven facts, or it may decline to do so."); *Ciccaglione v. State*, 474 A.2d 126, 131 (Del. 1984) ("Further, a jury is permitted to draw inferences from circumstantial evidence as from any other evidence submitted.").

gaps, Thomas argues, a jury could not have found that the State established each element of first degree murder or PFDCF beyond a reasonable doubt.

(13) After reviewing the evidence in the light most favorable to the prosecution, we conclude a rational jury could find beyond a reasonable doubt that Thomas fatally shot Hale with a firearm. The State presented evidence beyond Thomas's mere presence at the scene. The record reflects that a minute before the shooting Thomas walked in the direction of Hale's house with a ski mask covering his face, hood over his head, and his dominant hand in his pocket.[10] While no one witnessed the gunfire, a neighbor present at the time of the shooting told a State detective that he saw no one at the scene other than Thomas and Hale.[11] The first responding officer also found only Thomas at the scene, injured on the sidewalk.[12] Although the State recovered no weapon, a group huddled closely over Thomas as he lay on the sidewalk, leading to an inference that someone could have removed a weapon during the confusion.[13] A ShotSpotter analyst concluded the first five shots originated on the sidewalk.[14] And Thomas had GSR on his hands and the right pocket of his jacket.[15] While there was conflicting evidence and other inferences

---

[10] App. to Opening Br. at A063-64.
[11] App. to Answering Br. at B63, B66.
[12] App. to Opening Br. at A022.
[13] *Id.* at A023; A042.
[14] App. to Answering Br. at B26.
[15] App. to Opening Br. at A077-79.

that could be drawn from the evidence, we find that, based on the evidence cited above, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

NOW, THEREFORE IT IS ORDERED that the judgment of the Superior Court is AFFIRMED.

BY THE COURT:

/s/ *Collins J. Seitz, Jr.*
Chief Justice